> This Opinion is a
> Precedent of the TTAB

Mailed: December 21, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Australian Therapeutic Supplies Pty. Ltd.*
*v.*
*Naked TM, LLC*

————

Cancellation No. 92056381

————

Drew Smith and Gabrielle A. Holloway of Holley & Menker, PA,
    for Australian Therapeutic Supplies Pty. Ltd.

Suzanne D. Meehle and Davey T. Jay of Meehle and Jay,
    for Naked TM, LLC.

————

Before Kuhlke, Bergsman and Wolfson,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Naked TM, LLC ("Respondent") owns Registration No. 3325577 for the mark

NAKED (typed drawing) for "condoms," in Class 10.[1]

Australian Therapeutic Supplies Pty. Ltd. ("Petitioner"), alleging prior use of the

mark NAKED and NAKED CONDOMS both for condoms, filed a petition to cancel

Respondent's registration on the grounds of fraud, likelihood of confusion, and false

---

[1] Registered October 30, 2007; renewed.

suggestion of a connection.[2] Petitioner filed an Amended Petition for Cancellation adding the ground that Respondent did not possess the requisite bona fide intent to use the mark NAKED when it filed the underlying application for the registration at issue.[3]

Respondent, in its Amended Answer, denied the salient allegations in the Amended Petition for Cancellation and asserted several affirmative defenses.[4]

During the prosecution of this proceeding, Respondent filed a motion for summary judgment on its affirmative defenses of estoppel, laches, acquiescence, and unclean hands.[5] In its response, Petitioner cross-moved for summary judgment on its pleaded claim of likelihood of confusion under Trademark Act 2(d), 15 U.S.C. § 1052(d), and further asserted that Respondent's affirmative defenses are not applicable because the use of Respondent's mark would result in inevitable confusion with Petitioner's mark.[6] Respondent, in its reply brief, also opposed Petitioner's motion for summary judgment on the likelihood of confusion claim.[7]

In its March 3, 2016 Order, the Board held:[8]

---

[2] Because the petition for cancellation was filed on October 29, 2012, within five years of the registration date, likelihood of confusion is not time-barred. Trademark Act § 14(1); 15 U.S.C. § 1064(a).

[3] 24 TTABVUE 10. The Amended Petition is the operative pleading in this case.

[4] 37 TTABVUE.

[5] 42 TTABVUE.

[6] 52 TTABVUE.

[7] 54 TTABVUE.

[8] 56 TTABVUE.

- There are genuine disputes of material fact with respect to Petitioner's standing;[9]

- There are genuine disputes of material fact with respect to Respondent's affirmative defense of contractual estoppel;

- If Petitioner is able to establish its standing and priority, then confusion is likely and inevitable; and

- Respondent's motion for summary judgment on its affirmative defenses of laches, acquiescence and equitable estoppel, as well as unclean hands are denied on the ground that they are inapplicable because confusion is inevitable.[10]

The Board expressly set forth the status of the case:

> The case will go forward on Petitioner's proof of standing; on its claim of priority as a prerequisite to its claim of likelihood of confusion; and on its claims of false suggestion

---

[9] Because the Board found that there are genuine disputes of material fact regarding standing, we did not decide the issue of priority. 56 TTABVUE 12.

[10] As the Board explained in a prior order, contractual estoppel is not obviated by inevitable confusion because it is a threshold inquiry as to whether Petitioner lacks a "real interest" in seeking cancellation of Respondent's registration. 56 TTABVUE 17 n. 10.

> As noted earlier, Respondent's estoppel defense encompasses both contractual estoppel and equitable estoppel. Only the defense of equitable estoppel is negated by inevitable confusion. As noted in our discussion of Petitioner's standing, the issue of contractual estoppel is effectively a threshold inquiry into whether or not the parties entered into an enforceable agreement such that Petitioner now lacks a "real interest" in seeking cancellation of Respondent's registration or has "contracted away" its right to seek cancellation. Respondent's contract-based challenges to Petitioner's standing and claims survive our decision here.

*Id.*

of a connection under Trademark Act Section 2(a), and lack of bona fide intent under Trademark Act Section 1(b).

Respondent's second affirmative defense (estoppel) remains operative to the extent it is based on the disputed agreement between the parties. Respondent's sixth affirmative defense (failure to state a claim under Section 2(a) upon which relief may [be] granted); seventh affirmative defense (abandonment); and ninth affirmative defense (Petitioner lacks standing), similarly remain operative.[11]

The Board also advised the parties:

In view of our contingent finding of likelihood of confusion and inevitable confusion, trial evidence and briefing on the issue of likelihood of confusion vis-à-vis the *DuPont* factors are not necessary. The parties are advised to focus their efforts at trial on the issues of standing (*i.e.*, whether or not Petitioner is contractually estopped from asserting a "real interest" as a basis for damage or maintaining this cancellation action) and priority.[12]

An element in any likelihood of confusion case is whether plaintiff has a proprietary right in its pleaded mark. Because Petitioner filed its petition for cancellation on the basis of its unregistered NAKED and NAKED CONDOM trademarks, Petitioner must establish proprietary rights in those pleaded common-law marks. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981).

Under the rule of *Otto Roth*, a party opposing registration of a trademark due to a likelihood of confusion with his own unregistered term cannot prevail unless he shows that his term is distinctive of his goods, whether inherently or through the acquisition of secondary meaning or through

---

[11] 56 TTABVUE 21.

[12] 56 TTABVUE 21 n.14.

"whatever other type of use may have developed a trade identity." *Otto Roth*, 640 F.2d at 1320, 209 USPQ at 43.

*Towers v. Advent Software Inc.*, 913 USPQ F.2d 942, 16 USPQ2d 1039, 1041 (Fed. Cir. 1990).

In this regard, we note that Respondent's second and ninth affirmative defenses are based on facts that implicate whether Petitioner has a proprietary right in its purported common law rights and, thus, whether it has standing. The gist of Respondent's Second Affirmative Defense is that by April 2007, the parties reached an agreement that Petitioner would not sell NAKED condoms in the United States and that Petitioner is estopped from seeking to cancel Respondent's registration.[13] With respect to the Ninth Affirmative Defense, Respondent averred that because Petitioner agreed not to sell NAKED condoms in the United States, Petitioner does not have standing.[14]

However, it has been observed that "[a]n analysis of standing does not include an analysis of equitable defenses."[15] *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 346 (3d Cir. 2001). In view thereof, we view these allegations also as denials of Petitioner's standing that leave Petitioner to its proof of standing. *Id.* (appellate court analyzed both standing and equitable defense together because they formed the basis of the District Court's judgment); *see also Fahmy v. Jay Z, et. al.,* 908 F.2d 383, 394 (9th Cir. 2018) (entering judgment as a matter of law

---

[13] 37 TTABVUE 5.

[14] 37 TTABVUE 10.

[15] Amended Petition for Cancellation ¶¶6-11 (24 TTABVUE 7-8).

for defendants because plaintiff had transferred the right to prepare derivative works and, thus, lacked standing).

I. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Respondent's registration file.[16] The parties introduced the testimony and evidence listed below:

A. Petitioner's testimony and evidence.

1. Testimony declaration of Graham Porter, Petitioner's Managing Director and co-owner;[17]

2. Testimony declaration of Christopher Butler, Office Manager at the Internet Archive, a website that provides access to a digital library of Internet websites including the Wayback Machine;[18]

3. Testimony declaration of Jill Potter, custodian of records for PayPal, Inc.;[19]

4. Testimony declaration of Natalie Bucsko nee Varner, a consumer who purportedly purchased three packs of condoms on or about April 17, 2003, through condoms.au.com;[20]

---

[16] Because Respondent's registration file is of record by operation of the Trademark Rules of Practice, there was no need for Respondent to introduce it through a notice of reliance. 120 TTABVUE.

[17] 79-80 TTABVUE.

[18] 81 TTABVUE.

[19] 82 TTABVUE.

[20] 83 TTABVUE.

5. Testimony declaration of Sean Hayes, a consumer who purportedly purchased NAKED condoms through condoms.au.com on or about April 7, 2003;[21]

6. Notice of reliance on copies of 27 applications filed by Respondent's predecessor-in-interest and an affiliated company printed from the USPTO electronic database;[22]

7. Notice of reliance on copies of Petitioner's application Serial No. 78758237 for the mark NAKED CONDOMS for condoms, application Serial No. 85772589 for the mark NAKED for condoms, and Registration No. 3282564 for the mark NUDE CONDOM for condoms printed from the USPTO electronic database showing their current status;[23]

8. Notice of reliance on the following items:

   a. Respondent's amended responses to Petitioner's first set of requests for admission;[24]

   b. Respondent's amended responses to Petitioner's first set of interrogatories;[25]

---

[21] 84 TTABVUE.

[22] 85 TTABVUE.

[23] 86 TTABVUE.

[24] 87 TTABVUE 6.

[25] 87 TTABVUE 11.

    c. Respondent's second amended responses to Petitioner's first set of interrogatories;[26] and

    d. Respondent's responses to Petitioner's third set of requests for admission;[27]

9. Notice of reliance on the discovery depositions of the following individuals:

    a. Jud Ireland, Respondent's Managing Member;[28] and

    b. Cindy Mason, Mr. Ireland's former personal assistant;[29]

10. Notice of reliance on materials printed from the Internet;[30]

11. Rebuttal testimony declaration of Graham Porter;[31] and

12. Notice of reliance on an article posted on ConsumerReports.org dated February 2005.[32]

B. Respondent's testimony and evidence.

---

[26] 87 TTABVUE 20.

[27] 87 TTABVUE 26.

[28] 89 and 129 TTABVUE. Despite the fact that very little, if any, of the testimony or the exhibits constitute trade secret or commercially sensitive information, the excerpts from the Ireland deposition have been designated confidential in their entirety. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g), provides, in part, that "[t]he Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party." Accordingly, we will not be bound by the parties' designation.

[29] 88 TTABVUE 7. It was not necessary for Respondent to file its amended notice of reliance on the Mason discovery deposition already made of record by Petitioner. 107 TTABVUE. Trademark Rule 2.120(3)(ii)(7), 37 C.F.R. § 2.120(3)(ii)(7), provides that testimony from a discovery deposition made of record by one party may be referred to by any party for any purpose permitted by the Federal Rules of Evidence.

[30] 90 TTABVUE.

[31] 127 TTABVUE.

[32] 130 TTABVUE.

1. Notice of reliance on excerpts from the Graham Porter discovery deposition;[33]

2. Notice of reliance on "Articles of Incorporation with Statement of Conversion" filed with the Office of the California Secretary of State and the Office of the Delaware Department of State Division of Corporations;[34]

3. Notice of reliance on documents obtained from the websites from the California Secretary of State and Delaware Department of State Division of Corporations;[35]

4. Notice of reliance on records from the USPTO database for applications and registrations for marks consisting of the words NAKED and NUDE filed by Petitioner;[36]

5. Notice of reliance on Petitioner's amended responses to Respondent's first set of interrogatories (Nos. 7 and 8)[37] and Petitioner's amended responses to Respondent's second set of interrogatories (Nos. 17-19 and 24);[38]

---

[33] 104 TTABVUE. Respondent submitted a condensed version of the transcript rather than in full-sized format. *See* Trademark Rule 2.123(g)(1), 37 C.F.R. § 2.123(g)(1) ("The deposition transcript must be submitted in full-sized format (one page per sheet), not condensed (multiple pages per sheet).").

Although Respondent identified specific passages from the deposition upon which it is relying, Respondent introduced into the record the entire transcript. Accordingly, we consider the entire Graham discovery deposition as being of record.

[34] 105 TTABVUE 106. Exhibits E, G, and H filed in this notice of reliance were stricken in the Board's January 29, 2018 Order. 118 TTABVUE 3-6.

[35] 120 TTABVUE.

[36] 106 TTABVUE.

[37] 108 TTABVUE 5.

[38] 108 TTABVUE 24.

6. Testimony deposition of Jud Ireland, Respondent's principal;[39] and

7. Testimony declaration of Michael Glickman, a former Senior Vice President of Naked Int'l, Inc.[40] and Petitioner's cross-examination testimony deposition.[41]

## II. Standing

A threshold issue in every inter partes case is the plaintiff's standing to challenge registration. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *John W. Carson Found. v. Toilets.com Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010). To establish standing in an opposition or cancellation proceeding, a plaintiff must prove that it has "both a 'real interest' in the proceedings as well as a 'reasonable' basis for its belief of damage." *See Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982).

While Petitioner has proven that it has advertised and sold NAKED condoms in the United States through Petitioner's websites since April 2003,[42] Respondent argues that Petitioner has contracted away its standing, i.e., Petitioner's "real

---

[39] 109 TTABVUE. Respondent unnecessarily filed the Ireland deposition a second time at 112 TTABVUE.

[40] 110 and 111 TTABVUE.

[41] 126 TTABVUE.

[42] Porter Testimony Decl. ¶¶17-18, 23, 25-30 and Exhibits 7 and 9-13 (79 TTABVUE 6, 62 and 69-277).

interest," contending that the parties agreed that Petitioner would use and register NUDE for condoms while Respondent would use and register NAKED for condoms.

The Board is an administrative tribunal with jurisdiction over the question of registrability of U.S. trademarks. *See* Section 17 of the Trademark Act, 15 U.S.C. § 1067. The Board is empowered to determine only the right to register. Sections 17- 18, 20 and 24 of Trademark Act, 15 U.S.C. §§ 1067-68, 1070, 1092; *see also, e.g.*, *Conolty v. Conolty O'Connor NYC LLC*, 111 USPQ2d 1302, 1309 (TTAB 2014). However, the Board may consider the terms of a contract if, and to the extent that, construction of the contract is necessary to a decision on matters within the Board's jurisdiction. *See Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 217 USPQ 641, 647 (Fed. Cir. 1983); *M-5 Steel Mfg. Inc. v. O'Hagin's Inc.*, 61 USPQ2d 1086, 1094-95 (TTAB 2001); *see also Renaissance Rialto Inc. v. Boyd,* 107 USPQ2d 1083, 1086 (TTAB 2013) (interpreting contract to find no transfer of rights such as would allow named opposer to bring opposition). In that context, the Board may, in the exercise of its statutory jurisdiction, consider an agreement, its construction, or its validity, "although other courts would be the proper tribunals in which to litigate a cause of action for enforcement or breach of [that] contract." *Selva & Sons, Inc.*, 217 USPQ at 647.

The Court of Customs and Patent Appeals, the predecessor to our primary reviewing court, rejected an argument that a promise not to register a trademark is unenforceable as contrary to public policy favoring the litigation of challenges to trademark validity. The court held that any such policy is outweighed by the policy

favoring settlement of threatened or pending litigation: "If there be a policy favoring challenges to trademark validity, it too has been viewed as outweighed by the policy favoring settlements." *Wells Cargo, Inc. v. Wells Cargo, Inc.,* 606 F.2d 961, 203 USPQ 564, 568 (CCPA 1979) (citing *Danskin, Inc. v. Dan River, Inc.,* 498 F.2d 1386, 182 USPQ 370, 372 (CCPA 1974) (affirming grant of summary judgment dismissing opposition based upon a prior written settlement agreement that was signed by both parties)); *see also Ron Cauldwell Jewelry Inc. v. Clothestime Clothes Inc.,* 63 USPQ2d 2009, 2013 (TTAB 2002); *M-5 Steel Mfg. Inc. v. O'Hagin's Inc.,* 61 USPQ2d at 1088. Under certain circumstances a consent to register a mark may be implied from a consent to use the mark. *See, e.g., Richdel, Inc. v. Mathews Co.,* 190 USPQ 37, 41-42 (TTAB 1976); *CBS, Inc. v. Man's Day Publ'g Co., Inc.,* 205 USPQ2d 470, 476 (TTAB 1980) (dismissing opposition because opposer consented to and encouraged applicant's use of the mark MAN'S DAY).

In this case, there is no formal written agreement; however, the Board recognizes oral and informal agreements. *See e.g., Nestle Co. Inc. v. Nash-Finch Co.*, 2 USPQ2d 1085 (TTAB 1987) (written license not required); *John Anthony, Inc. v. Fashions by John Anthony, Inc.*, 209 USPQ 517 (TTAB 1980) (oral license between employer and former employee). The elements necessary to determine that a contract exists are: (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. *See D & N Bank v. U.S.*, 331 F.3d 1374, 1378 (Fed. Cir. 2003); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000) ("to be valid and enforceable, a contract must have both consideration to ensure mutuality of

obligation and sufficient definiteness so as to provide a basis for determining the existence of a breach and for giving an appropriate remedy.") (internal citations omitted).

We review the relevant actions and communications between the parties to determine whether the parties had reached an agreement regarding their respective use and registration of the NAKED trademark. The communications were by email between the principals of the parties.

- Petitioner advertised the sale of NAKED condoms on its condoms.au.com website as of August 11, 2002;[43]

- Petitioner sold and shipped NAKED condoms to purchasers in the United States as of April 3, 2003;[44]

- Between 2003 and 2015, Petitioner never had more than 48 consumers for NAKED condoms in the United States in any one year via Internet sales;[45]

- On September 22, 2003, Respondent filed its application for the registration at issue;[46]

---

[43] Porter Testimony Decl. Exhibit 7 (79 TTABVUE 62-65).

[44] Porter Testimony Decl. Exhibit 9 (79 TTABVUE 70). *See also* Porter Testimony Decl. Exhibits 10 and 11 (79 TTABVUE 182-190).

[45] Petitioner's amended response to Respondent's interrogatory No. 17 (108 TTABVUE 29-30).

[46] Respondent filed a statement of use on June 19, 2007, alleging first use as of April, 2007.

- On November 21, 2005, Petitioner filed intent-to-use application Serial No. 78758237 for the mark NAKED CONDOMS (condoms disclaimed) for "condoms, including condoms made of latex," in Class 10;[47]

- On November 21, 2005, Petitioner filed application Serial No. 78757257 for the mark NUDE CONDOM (condom disclaimed) for "condoms, including condoms made of latex," in Class 10, under Section 44(d) of the Trademark Act and intent-to-use;[48]

- Petitioner learned about Respondent and its application for the NAKED trademark in the United States at least as early as November 22, 2005;[49]

- On July 26, 2006, Petitioner emailed Respondent informing Respondent that Petitioner has been marketing NAKED condoms in the United States via the Internet prior to the filing of Respondent's application, opening negotiations to resolve the NAKED trademark issue, including assigning Petitioner's application for NUDE CONDOM to Respondent;[50]

- On September 6, 2006, Respondent emailed Petitioner inquiring about the status of Petitioner's NAKED trademark and expressing concern and doubt about whether both parties can use NAKED for condoms in the United States;[51]

---

[47] 86 TTABVUE 7. The application was abandoned on September 28, 2011.

[48] 86 TTABVUE 38. Registered under Reg. No. 3282564 on August 21, 2007, renewed.

[49] Porter Testimony Decl. Exhibit 22 (79 TTABVUE 345).

[50] Porter Testimony Decl. Exhibit 25 (79 TTABVUE 352).

[51] Porter Testimony Decl. Exhibit 27 (79 TTABVUE 357).

- On September 11, 2006, Petitioner emailed Respondent informing Respondent that the distribution of Petitioner's FOUR SEASON NAKED condoms "has been going very well" and that because neither party appears willing to relinquish its right to use the NAKED trademark, Petitioner has authorized its lawyers to draft a coexistence agreement;[52]

- On December 18, 2006, Petitioner emailed Respondent a draft copy of the coexistence agreement.[53] The draft agreement provides, in essence, that

  - Petitioner shall not use NAKED or NUDE in the United States other than as a subbrand for its core FOUR SEASONS mark; and

  - Respondent shall not use or register any marks that are similar to Petitioner's non-NAKED marks;[54]

- On January 3, 2007, Respondent emailed Petitioner a counterproposal that "would be the basic terms of a final written agreement" providing that: (i) Petitioner will not use or register any mark containing the word NAKED in the United States and (ii) Respondent will not use or register any mark containing the word NUDE in the United States;[55]

---

[52] Porter Testimony Decl. Exhibit 27 (79 TTABVUE 356).

[53] Porter Testimony Decl. Exhibit 28 (79 TTABVUE 361-370).

[54] Porter Testimony Decl. Exhibit 28 (79 TTABVUE 364-365).

[55] Porter Testimony Decl. Exhibit 30 (79 TTABVUE 374).

- On April 4, 2007, the parties exchanged emails. Respondent told Petitioner that Respondent was "coming to market" and that they should put their agreement "on paper."[56] Petitioner replied

    [N]o need to put anything on paper. Just makes lawyers a lot of money. We no longer have any Naked condoms in the USA, so it should be clear sailing for you. Good luck with the launch.[57]

---

[56] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 295) (80 TTABVUE 263). Petitioner did not introduce the email referred to in the testimony. Porter Testimony Decl. Exhibit 51 is the Graham Porter discovery deposition. The April 4, 2007 emails were identified as Porter Discovery Exhibit 44. Porter Discovery Exhibit 44 was not made of record.

[57] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 295) (80 TTABVUE 264). Mr. Porter testified that when he wrote that email, he did not mean that the parties had an agreement. To the contrary, Mr. Porter testified that "I didn't want an agreement in writing that would give away my rights to that [the NAKED trademark]." 80 TTABVUE 266.

> Q. When you said, "We no longer have any Naked condoms in the USA, so it should be clear sailing for you," what did you mean by that?
>
> A. What I meant by that is I have made a decision at this time once we [Petitioner] found a new supplier that we [Petitioner] were going to market Nude from ATS, Inc. and Naked from ATS Australia.
>
> Q. Let's focus on these words "so it should be clear sailing for you." What do these words mean, "so it should be clear sailing for you?" When you wrote that to my client, what were you telling him?
>
> A. That he [Respondent] was going to market with his [Respondent's] Naked condoms.
>
> Q. … Wasn't it your intention in using these words that you were no longer going to interfere with his sale of Naked condoms in the USA?
>
> A. No, I very much wanted to have a coexistence.

Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 298-99) (80 TTABVUE 266-67).

- On August 21, 2007, Petitioner's application Serial No. 78758257 for the mark NUDE CONDOM registered as Registration No. 3282564;[58]

- On October 30, 2007, Respondent's application Serial No. 78303400 for the mark NAKED registered as Registration No. 3325577, the registration at issue;[59]

- On March 12, 2011, Respondent emailed Petitioner thanking Petitioner "for discontinuing your sub brand naked" and asking Petitioner to remove NAKED condoms from its TWITTER site because it was causing confusion;[60]

- On March 13, 2011, Petitioner emailed Respondent pointing out that Petitioner has been using the NAKED brand in Australia before Respondent began using the NAKED brand and that since Petitioner "helped out last time it would be great if [Respondent] could take down [Respondent's] twitter site as a small favor to [Petitioner]." In closing, Petitioner asked "How are the Naked condoms going?"[61]

---

[58] 86 TTABVUE 38. The application was published for opposition on February 13, 2007. No one filed an opposition to the registration of Petitioner's mark. 86 TTABVUE 40.

[59] Respondent's application was published for opposition on June 8, 2004. No one filed an opposition to the registration of Respondent's mark.

[60] Porter Testimony Decl. Exhibit 35 (79 TTABVUE 389).

[61] Porter Testimony Decl. Exhibit 35 (79 TTABVUE 388).

- On March 14, 2011, Respondent emailed Petitioner acknowledging Petitioner's rights to the NAKED brand in Australia but pointing out that Petitioner's FOUR SEASONS brand appears to be Petitioner's main focus;[62]

- On August 31, 2011, Respondent emailed Petitioner stating that Respondent's launch of NAKED condoms was going well, that Respondent is selling worldwide except for Australia, and asking Petitioner to transfer its rights to NAKED to Respondent;[63]

- As of September 3, 2011, Petitioner abandoned application Serial No. 78528237 for the mark NAKED CONDOMS;[64]

- On September 4, 2011, Petitioner emailed Respondent stating that Petitioner "still get[s] lots of requests for NAKED in the USA" and that Petitioner will not transfer any rights;[65]

---

[62] Porter Testimony Decl. Exhibit 35 (79 TTABVUE 387).

[63] Porter Testimony Decl. Exhibit 36 (79 TTABVUE 391).

[64] 86 TTABVUE 7. Despite Petitioner's assertion that it was still selling NAKED condoms in the United States via the Internet and despite Petitioner's prior of use of the NAKED mark, Petitioner expressly instructed counsel to abandon the NAKED CONDOMS trademark application because a registration "wasn't required for the product at the time" due to the global financial crisis. Also, it allowed Petitioner "to stall for time." Porter Discovery Dep., p. 340-41 (104 TTABVUE 90). If, as Petitioner asserts, the parties only had an agreement to coexist and were in negotiations for a more comprehensive agreement, it would seem to undercut Petitioner's position that that Petitioner would allow its application for NAKED CONDOMS to go abandoned rather than use it for whatever leverage it may have in those negotiations.

[65] Porter Testimony Decl. Exhibit 36 (79 TTABVUE 391). As noted above, Petitioner never had more than 48 consumers via Internet sales in any year. Petitioner's amended response to Respondent's interrogatory No. 17 (108 TTABVUE 29-30). In 2010, Petitioner had "at least 25" customers and in 2011 Petitioner had "at least 48" customers. *Id.*

- On September 5, 2011, Respondent emailed Petitioner offering to acquire Petitioner's rights to the NAKED mark in Australia;[66]

- On September 20, 2011, Petitioner emailed Respondent stating that Petitioner has been using the NAKED mark for "a lot longer than [Respondent] in the USA via [Petitioner's] direct selling into the USA from years ago.";[67]

- On September 21, 2011, Respondent emailed Petitioner stating that because the parties had agreed that Petitioner would use the NUDE trademark and Respondent would use the NAKED trademark and because Respondent has registered the NAKED mark in approximately 36 countries, Petitioner should stop selling NAKED condoms in the United States via the Internet;[68] and

- On September 21, 2011, Petitioner emailed Respondent stating that "We have no agreement in place other than we agreed to co-exist."[69]

Petitioner's actions and communications led Respondent to believe that the parties agreed that Petitioner would not use or register the mark NAKED in connection with condoms in the United States and that Respondent could use and register the mark NAKED in the United States. Specifically,

- In the April 4, 2007 email exchange Petitioner wrote

---

[66] Porter Testimony Decl. Exhibit 37 (79 TTABVUE 395).

[67] Porter Testimony Decl. Exhibit 38 (79 TTABVUE 399).

[68] Porter Testimony Decl. Exhibit 38 (79 TTABVUE 398).

[69] Porter Testimony Decl. Exhibit 38 (79 TTABVUE 398).

> [N]o need to put anything on paper. Just makes lawyers a lot of money. We no longer have any Naked condoms in the USA, so it should be clear sailing for you. Good luck with the launch.[70]

Thus, Petitioner expressly stated that it no longer had any NAKED condoms in the United States. But more telling, Petitioner did not inform Respondent that it had any plans to continue selling NAKED condoms in the United States via the Internet from Australia;

- In the March 2011 email exchange regarding the confusion caused by Petitioner's use of the NAKED trademark on its TWITTER account, when Respondent thanked Petitioner "for discontinuing your sub brand naked," Petitioner did not correct Respondent and explain that Petitioner believed it retained the right to sell NAKED brand condoms in the United States via the Internet. In fact, Petitioner said that because it "helped out the last time" presumably meaning that because Petitioner stopped using NAKED in the United States, Respondent should take down its TWITTER site;

- As of September 3, 2011, Petitioner abandoned application Serial No. 78528237 for the mark NAKED CONDOMS; and

- Throughout all of the communications between Petitioner and Respondent, Petitioner never stated or reminded Respondent that Petitioner was retaining the right to sell NAKED condoms in the United States via Internet sales from Australia.

---

[70] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 295) (80 TTABVUE 264).

The evidence shows that the parties reached an agreement. The mutuality of intent to contract is satisfied because the parties recognized their trademark issue and they communicated and exchanged offers to resolve it. The consideration for the contract is Petitioner's agreement not to use or register the NAKED trademark for condoms in the United States and Respondent's agreement not to use or register the NUDE trademark for condoms. Finally, the lack of ambiguity in offer and acceptance is evidenced by the facts that Petitioner stopped using the NAKED mark in the United States, Petitioner did not interfere with Respondent's use and registration of the NAKED mark in the USPTO, Petitioner registered the NUDE trademark in the United States, and Respondent did not interfere with Petitioner's use and registration of the NUDE trademark in the USPTO.

That we are dealing with an informal or oral agreement or contract rather than a written contract does not diminish the effect of the agreement. The parties had reached an agreement as evidenced by the April 4, 2007 email where Respondent told Petitioner that the parties should put their agreement in writing and that Respondent wanted it memorialized.[71] Petitioner did not object and assert that was no agreement, rather Petitioner advised Respondent not to get the lawyers involved to put the agreement in writing.[72] If there was no agreement, Petitioner would have advised Respondent that there was no agreement or at least questioned Respondent as to why it wrote that there was an agreement. Moreover, there would be no need

---

[71] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 295) (80 TTABVUE 263).

[72] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 295) (80 TTABVUE 264).

for Petitioner to advise Respondent not to get the lawyers involved. Petitioner did not want to have lawyers formalize a written agreement because Petitioner did not want Respondent to find out that Petitioner intended to circumvent their oral agreement and continue selling NAKED condoms in the United States via the Internet. Had lawyers gotten involved to put the agreement "on paper," Petitioner surely would have been forced to expressly state that it was continuing to sell NAKED condoms in the United States via the Internet. As noted above at footnote 58, Mr. Porter testified that "I didn't want an agreement in writing that would give away my rights to that [the NAKED trademark]."[73] But Petitioner never expressed to Respondent that Petitioner had plans to continue selling NAKED condoms in the United States via the Internet from Australia.

Graham Porter, Petitioner's principal, testified that the parties had an agreement in place for the United States,[74] corroborating our finding that the parties reached an agreement and that Petitioner led Respondent to reasonably believe that Petitioner had abandoned its rights in the United States to the NAKED mark in connection with condoms.

> Q.    You communicated to [Respondent] didn't you, that you would agree to adopt Nude and not sell Naked in the United States?
>
> A.    It was part of the negotiation that was still taking place. Yes.
>
> Q.    And you agreed to it?

---

[73] 80 TTABVUE 266.

[74] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 301) (80 TTABVUE 268).

A.     In essence, I did agree.[75]

               *       *       *

Q.     What was the agreement?

A.     The important agreement that we wanted to have where we would coexist in the marketplace was [Petitioner] was going to withdraw Naked from being sold from our USA entity, which, as you have seen, that the numbers aren't huge.

Q.     And what would [Respondent] do?

A.     Nothing. He did nothing.

Q.     He let you have Nude; right?

A.     Right, and he continued to sell Naked the whole time.

Q.     And you ran with Nude; right?

A.     We ran with both.

Q.     You ran with Nude - -

A.     Nude from the USA and then Naked from Australia.

Q.     Notwithstanding that you told him that you no longer have any Naked condoms in the USA; right?

A.     Which is true. We had them in Australia. We continued selling from Australia.[76]

As part of the agreement, Respondent would not oppose Petitioner's pending application for the NUDE mark.[77]

---

[75] Porter Discovery Dep., p. 253 (104 TTABVUE 68).

[76] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 300-01) (80 TTABVUE 268-69).

[77] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 302) (80 TTABVUE 270) (ATS, Inc. would not sell any FOUR SEASONS NAKED condoms in the United States and in exchange, Respondent would not oppose Petitioner's NUDE application). *See also* Porter

Petitioner characterized the agreement as "a gentleman's agreement."[78]

  A. We had a gentleman's agreement that in the USA [Petitioner] would sell Nude and sell Naked from Australia. We still hadn't resolved our agreement.[79]

     \*  \*  \*

  Q. Mr. Porter, you gave the man [Ireland/Respondent] your word in April of 2007 that you would take Nude in the U.S., he would take Naked in the U.S., right, recognizing your caveat that you believe you retained the right to do Internet sales. But you don't dispute that you said, Jud [Respondent], go ahead and use Naked?

  A. I don't dispute that at all. I don't think it's the same question.

  Q. So just explain it. Since we are all in agreement that you said that to him, I will take Nude, you take Naked - -

  A. And I will sell Naked in the U.S. from Australia.

  Q. Tell me why you believe five years after you reached that agreement with him, five years after he began investing and spending money and developing the mark that you had the right to come in and file a cancellation proceeding to take away that which you agreed that he could do and which he relied on for years before you did this. Tell me why you believe you believe [sic] you had the right to do that.

---

Discovery Dep., p. 259 (104 TTABVUE 70) (Respondent's agreement not to object to Petitioner's NUDE application was of material consideration to Petitioner).

[78] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 353) (80 TTABVUE 275). *See also* Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 301-02) (80 TTABVUE 269-70).

[79] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 392) (80 TTABVUE 291).

> A. When he sent this letter, it was basically destroying any agreement that we had in place as far as I'm concerned.[80]

We find the only reasonable interpretation of the entirety of the communications is that Petitioner agreed not to use the NAKED trademark in connection with condoms in the United States via Internet sales. Because Petitioner's Internet sales in the United States were de minimis, if Respondent even were aware of them, such sales did not require any action until Petitioner's TWITTER activities purportedly caused some instances of confusion.

Petitioner's standing is intrinsically connected with the question of whether the parties have an enforceable agreement that precludes Petitioner from using or registering the mark NAKED or NAKED CONDOMS and from challenging Respondent's use and registration of the NAKED mark. Petitioner's actions and communications stating that it no longer had any NAKED brand condoms in the United States so that it should be "clear sailing" for Respondent to launch its NAKED brand condoms caused Respondent to reasonably believe that any rights Petitioner had in the NAKED trademark for condoms had been abandoned. Therefore, we find that Petitioner agreed that it would not use or register the mark NAKED for condoms in the United States and that Respondent could use and register the mark NAKED for condoms in the United States. In view thereof, Petitioner failed to prove that it has standing to cancel the registration because Petitioner does not have a real

---

[80] Porter Testimony Decl. Exhibit 51 (Porter Discovery Dep., p. 432-33) (80 TTABVUE 297-98). Respondent had its trademark counsel send Petitioner a letter demanding that Petitioner stop selling NAKED condoms in the United States via the Internet. Porter Decl. Exhibit 66 (80 TTABVUE 358).

interest in this proceeding or a reasonable basis for its belief of damage, having contracted away its right to use and register NAKED and by extension NAKED CONDOMS. Accordingly, Petitioner lacks standing.

Because Petitioner does not have standing to bring this cancellation, we need not decide the issues of priority, whether Respondent had a bona fide intent to use NAKED when it filed its application for registration, or whether Respondent's use and registration of NAKED creates a false suggestion of a connection with Petitioner's name or identity. *See Multisorb Tech., Inc. v. Pactive Corp.*, 109 USPQ2d 1170, 1171-72 (TTAB 2013) (we have "discretion to decide only those claims necessary to enter judgment and dispose of the case," as our "determination of registrability does not require, in every instance, decision on every pleaded claim.") (citing *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 USPQ2d 2036, 2039-40 (TTAB 1989)), *aff'd*, 923 F.2d 869, 17 USPQ2d 1726 (Fed. Cir. 1990) (non-precedential).

**Decision**: The Amended Petition for Cancellation is denied.